815 F.2d 703
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Thomas FULFORD, Plaintiff-Appellee,
v.
CONSOLIDATED RAIL CORPORATION, Defendant-Appellant.
 No. 86-3075.
 United States Court of Appeals, Sixth Circuit.
 March 10, 1987.
 
 Before JONES and GUY, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff, Thomas Fulford, a furloughed trackman employee of defendant Consolidated Rail Corporation (Conrail), filed this employment discrimination case before the district court pursuant to 42 U.S.C. Sec. 2000e et seq. and Ohio Rev.Code Sec. 4112.02. Fulford alleged that he was denied a promotion to the position of truck crane operator because he is black and because of his age, and claimed that if he had been promoted he would not have been furloughed. He further alleged that he was not recalled from furlough due to his age. Fulford's age discrimination and state law claims were resolved in Conrail's favor. However, following a six-day bench trial, the court found that Conrail had violated Title VII in its failure to promote plaintiff and awarded back pay and attorneys' fees under 42 U.S.C. Secs. 2000e-5(k) and 1988. In addition, the court assessed fees against Conrail's attorneys personally pursuant to 28 U.S.C. Sec. 1927,[1] for withholding certain documents during discovery and thereby unreasonably hindering the course of the litigation.
 
 
 2
 Defendant Conrail claims the court erred both in its ruling in favor of plaintiff on his Title VII claim and the award of fees. Because we find no error in the district court's decision, we affirm.
 
 I.
 
 3
 Fulford is a 54 year old black male who began operating cranes in 1952. He was first hired by Conrail as a crane operator in 1976. In December of that year, plaintiff was dismissed because his religious convictions concerning observance of the Old Testament Sabbath made him unable to work the evening shift, to which he was assigned, on Fridays. At the time of his dismissal, he was a member of the International Brotherhood of Electrical Workers and had the least seniority among Conrail's crane operators on its crane operator roster.
 
 
 4
 On September 21, 1977, Fulford was rehired by Conrail as a trackman. His position was covered by the collective bargaining agreement between Conrail and the Brotherhood of Maintenance of Way Employees (BMWE). Fulford's previous seniority as a crane operator in a different union could not be credited to him and he was placed on the trackman roster as a new employee as of September 21, 1977. Although Fulford was on the trackman roster, Conrail regularly assigned him to work other jobs. He worked at various times as a truck driver, foreman, backhoe operator, and crane operator. He was able to work these jobs in part because he was certified as a truck driver, crane operator, acting foreman, air truck operator, auto truck operator, burro crane operator, and a rail highway truck operator. He earned certification by competently performing the various tasks under the observation of Conrail supervisors. Fulford was given an "M.W. 200" card as proof of his certification for these jobs and he was required to carry the card with him at all times while on duty. Fulford was never awarded any of these other positions on a permanent basis, and each time his assignment to these other positions ended, he returned to the pay and position of trackman, where his status on the trackman roster remained unchanged.
 
 
 5
 On September 24, 1982, Fulford was recalled from furlough and told to report to Erie, Pennsylvania, for assignment as a truck crane operator. He spent approximately six to seven weeks operating the crane and travelling with it between Erie, Pennsylvania; Dunkirk, New York; and Ashtabula, Ohio. The truck crane could be driven on railroad tracks or on the highway. As its operator, Fulford had to be able to use the hydraulics which raised and lowered the steel wheels necessary to make the transition from highway to rails. He was also required to carry his own tools to do necessary maintenance on the truck crane and, depending on the job, make adjustments to the brakes and electrical cables and install or remove attachments to the crane such as the electromagnet or the bucket. Fulford was able to perform all these tasks. Throughout the trial, Conrail stipulated that Fulford was eminently competent in all the jobs for which he had been certified, including the crane operator position.
 
 
 6
 On October 11, 1982, Conrail posted a bulletin advertising the truck crane operator position which Fulford had been filling. The pertinent parts of that advertisement were as follows:
 
 Position:
 
 7
 One (1) Class 1 Operator-Truck Crane 3 CT 1554
 
 Qualifications:
 
 8
 Must be able to read and write the English language. Must satisfactorily pass examination on General Instructions for machine operators, S7C Safety Rules, Rules of the Transportation Department, and actual operation of machine. Provide necessary hand tools and may be required to give practical demonstration of your qualifications. Must perform daily maintenance and make minor repairs to machine and other duties as required. Must have valid drivers license as required by State law.
 
 
 9
 Bids must be submitted to the undersigned on Form CT-88 no later than 5:00 PM on October 18, 1982.
 
 
 10
 Fulford submitted his bid on the appropriate Form CT-88 in timely fashion. However, the position was officially awarded to William Penniman, a white man, on October 25, 1982. On October 27, Penniman visited the job site while Fulford was working. He looked inside the crane and Fulford showed him the controls. After observing for approximately one hour, but without entering or operating the crane, Penniman declined the job and left. The following day, an announcement was posted cancelling the initial October 11 job advertisement. Plaintiff made a telephone inquiry to the Cleveland office to complain about cancellation of the job bulletin, which was done in violation of the union contract which prohibited cancellation of bulletins after they had been posted for more than seven days. Plaintiff was told only that someone in management had ordered it cancelled.
 
 
 11
 Three days later, November 1, a new advertisement, identical to that of October 11, was posted for the same truck crane operator's position. Fulford again submitted his bid on November 4. Although no bulletin was posted announcing the award, Fulford learned that the position had been awarded to D.K. Heller, a white man. Heller never even visited the job site, but declined the offer on November 15. Later that same day, an announcement was posted awarding the position to J.J. Walsh, a white man. Walsh appeared at the crane on November 18, 1982, in New York where Fulford was still on the job. He did not bring any tools with him and plaintiff did not see Walsh operate the crane. An employee status change form was issued on November 19 furloughing Fulford effective the previous day; he has not been recalled to work since.
 
 
 12
 Plaintiff initiated a grievance over Conrail's cancellation of the initial job bulletin and failure to award him the job after Penniman declined. Conrail's response conceded that cancellation of the bulletin was an error, but denied his claim nevertheless, stating that "the current agreement does not require the job going to the next highest bidder. Even if that were the case you are not the next highest qualified bidder." (App. at 172). Plaintiff pursued his claim further and received a response again acknowledging the irregularity in the procedure by which the position was advertised but denying his claim based on his alleged lack of seniority. Plaintiff then initiated this suit in June, 1984.
 
 II.
 
 13
 In response to Fulford's claim of discrimination, Conrail alleged that the sole reason he was not awarded the job was because its collective bargaining agreement with the union required that jobs be awarded strictly on the basis of seniority and that the other employees to whom the job was offered had more seniority than plaintiff.[2] The testimony at trial focused on the provisions of the collective bargaining agreement which Conrail claimed it applied, the seniority dates for the men involved, and the procedures followed in awarding the crane operator position at issue.
 
 
 14
 The bidding procedure which Conrail is required to follow in filling vacancies is contained in Rule 3, Section 3, of the collective bargaining agreement:
 
 
 15
 Section 3. advertisement and award.
 
 
 16
 (a) All positions and vacancies will be advertised within thirty (30) days previous to or within twenty (20) days following the dates they occur. The advertisement shall show position title, rate of pay, headquarters, tour of duty, rest days and designated meal period.
 
 
 17
 * * *
 
 
 18
 (e) An advertisement may be cancelled within seven (7) days from the date advertisement is posted.
 
 
 19
 (f) An employee who desires to withdraw his bid or application for an advertised position or vacancy must file his request, in writing, with the official whose name appears on the advertisement within seven (7) days from the date the advertisement is posted.
 
 
 20
 Section 4(a) of Rule 3 provides for the temporary filling of vacancies "pending advertisement and award."
 
 
 21
 The contractual provisions governing the assignment of vacancies are as follows:
 
 RULE 3--SELECTION OF POSITIONS
 
 22
 Section 1. Assignment to position.
 
 
 23
 In the assignment of employees to positions under this Agreement, qualification being sufficient, seniority shall govern.
 
 
 24
 The word "seniority" as used in this Rule means, first, seniority in the class in which the assignment is to be made, and thereafter, in the lower classes, respectively, in the same group in the order in which they appear on the seniority roster.
 
 
 25
 Section 2. Qualifications for positions.
 
 
 26
 In making application for an advertised position or vacancy, or in the exercise of seniority, an employee will be permitted, on written request, or may be required, to give a reasonable, practical demonstration of his qualifications to perform the duties of the position.
 
 
 27
 (Emphasis added).
 
 
 28
 Seniority in a "class" is determined by an employee's presence on the applicable "seniority roster." Conrail maintains a total of twenty-six different rosters for various positions; however, the only two relevant to this appeal are the machine operator and the trackman rosters. The machine operator roster contains three classes, each one from class three up to class one denoting previous experience in operating progressively more sophisticated machinery as well as receipt of higher pay. To earn a place on this roster, an employee must be formally awarded one of the jobs contained on that roster and demonstrate his ability to successfully perform that job within thirty days. Provision for this thirty-day "trial period" is contained in Rule 3, Section 5:
 
 
 29
 An employee failing to qualify for a position within thirty (30) days will not acquire seniority dating on the position for which he failed to qualify and will, within five (5) working days, return to his former position....
 
 
 30
 Although Fulford had operated a number of the machines contained in the class one and class two machine operator rosters, and Conrail stipulated that he was undisputedly competent to operate all of the cranes on the class one roster, his name did not appear on that roster because, according to Conrail, all of the jobs plaintiff had filled had been temporary positions only in which one does not accrue specialized seniority. Therefore, plaintiff's name appeared only on the general trackman roster, which contained the names and dates of hire for all members of BMWE.
 
 
 31
 Conrail's contention before the district court and on appeal is that, since Fulford did not have the requisite seniority on the machine operator roster to be awarded the position, he was therefore not "qualified" for that job. They argue that the provisions of Rule 3, Section 1, clearly make seniority the only criteria for awarding positions, with the most senior employee then having thirty days to "subsequently qualify for a position where that employee lacked the requisite experience." Brief for Appellant at 18.
 
 
 32
 Conrail's Senior Director of Labor Relations, George Bent, testified about the considerations that went into the collective bargaining agreement which he had helped to negotiate and draft. Bent testified that after bids are received, the first consideration is for seniority within the applicable class (here, the machine operator roster). First preference is given to applicants with seniority in class one, but if no applicants possess class one seniority, class two and class three seniority is assessed. Only if no applicants possess seniority on the machine operator roster will trackman seniority be considered. After prioritizing applicants by seniority, Bent testified that "you look to the qualifications of the individuals." The phrase "qualification being sufficient" meant an employee must have "minimal ability to perform the task required." (App. at 257). Bent further testified that the purpose of Rule 3, Section 3(e), prohibiting cancellation of an advertisement after seven days, was to prevent the company from refusing to award a position when the bids received were not from applicants to the company's liking. It is undisputed that the bulletin initially advertising the crane operator's position was cancelled seventeen days after posting in violation of Section 3(e). Among the bids submitted in response to the second advertisement of November 1 were those of Heller and Fulford, both of whom had bid on the first position. Although Heller did not have machine operator class one seniority when his first bid was submitted, his subsequent bid indicated that he was awarded such seniority on November 1, the day the second bulletin was posted. Neither Penniman nor Heller were penalized for declining appointment after submitting their bids in violation of Section 3(f). In addition, it appears that Walsh did not bid on the first position at all, and therefore would not have had an opportunity to be considered for that position had the job not been cancelled and re-advertised.
 
 
 33
 Ted Burr, an office manager in Labor Relations for Conrail, testified that Penniman and Heller were appointed because they both had machine operator class one seniority. However, the 1984 machine operator roster did not indicate that either man had class one seniority. Penniman's name did not appear on the roster at all; Heller's name was followed by a dash in the class one column, which Burr testified indicated no seniority. Burr further testified that neither Penniman, Heller, nor Walsh were trained to operate cranes; had any experience operating cranes; or were ever awarded M.W. 200 certificates indicating successful performance in previous crane operator positions.
 
 
 34
 At the end of plaintiff's case, Conrail objected to the use of the 1984 roster, which it had supplied to Fulford during discovery and to the court as one of the exhibits upon which it intended to rely. They produced a copy of the 1982 roster, wherein Penniman's name appeared with a class one seniority date of November 1, 1982, pencilled in by hand over a typewritten dash. A class one seniority date of November 15, 1982, was also handwritten over the typewritten dash next to Walsh's name. Conrail's explanation for these discrepancies was that a "clerical error" had occurred. During presentation of its defense, Conrail also introduced additional personnel records of Penniman, Heller, and Walsh which had not been provided to the plaintiff, including M.W. 200's for both Penniman and Heller purporting to show their qualifications for the crane operator position.
 
 III.
 
 35
 The district court comprehensively examined plaintiff's claim under the McDonnell Douglas/Burdine/Aikens formula. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); United States Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983). The court found that plaintiff had succeeded in establishing a prima facie case of discrimination; i.e., membership in a protected class, rejection for the position despite being qualified and having properly applied, and subsequent attempts by the employer to fill the same position with comparably qualified persons. The court further found that Conrail had articulated a legitimate, nondiscriminatory reason for its action; namely, that it was following the alleged mandate of the collective bargaining agreement in appointing the most senior employee within the relevant class without regard to qualifications. The court correctly noted that "at this stage, the McDonnell-Burdine presumption "drops from the case," and that the court's task was to "decide which party's explanation of the employer's motivation it believes." Aikens, 460 U.S. at 715-16 (citations omitted). Following Justice Blackmun's concurrence in Aikens, this court has declared that the plaintiff's ultimate burden may be met either by persuading the court that the employment decision more likely than not was motivated by a discriminatory reason, or by showing that the employer's proffered reason is not worthy of belief. Fields v. Bolger, 723 F.2d 1216, 1219 (6th Cir.1984).
 
 
 36
 In the instant case, the district court concluded that Conrail's explanation was unworthy of belief. In so holding, the court pointed out that the collective bargaining agreement does not state that seniority alone governs, but also required "sufficient qualifications," which Conrail's own representatives testified means "minimal ability to perform the task required." One of the requirements for the crane operator position was the ability to pass a safety rule examination. Rule 3260 of the employee's handbook on safety rules provides that:
 
 
 37
 An unqualified person may not be authorized to operate such equipment unless qualifying and provided he is being directly and constantly supervised by an employee qualified on the particular equipment or machinery.
 
 
 38
 A qualified person shall be provided with a qualification case, Form M.W. 200, which he must keep on his person while on duty.
 
 
 39
 Although Fulford had an M.W. 200 authorizing him to operate cranes, neither Heller nor Walsh had such demonstrated expertise. Further, the listed qualifications for the job included possession of the necessary hand tools as well as maintenance and repair of the machine; neither Penniman nor Walsh had the required tools. Finally, state law required the person filling this position to have a valid chauffeur's license, which none of the men actually awarded the job possessed.
 
 
 40
 The district court was also troubled by Conrail's failure to follow established bidding procedures. Not only was the first advertisement cancelled "in error," but the rosters produced to support defendant's allegations were found to be "entirely suspect." (App. at 195). Initially, Conrail alleged that the award was based on the trackman seniority roster. However, when inconsistencies regarding their position and the contract provisions were brought to light, Conrail then attempted to rely on documents withheld from plaintiff during discovery and which contained pencilled notations granting class one seniority rights to two of the persons awarded the position on dates surprisingly close to their selection for the position. The court was also disturbed by testimony of one of Conrail's witnesses to the effect that temporary assignments could technically continue "forever," and that the decision to create a "permanent" position was entirely within the discretion of the division engineer who apparently violated the collective bargaining agreement's provisions regarding the advertising and award of positions at will. The court concluded, "[i]n short, the process of awarding temporary and permanent positions is simply too vulnerable to manipulation, and the rosters are too susceptible to "error," "clerical" or otherwise, to be credited as the legitimate nondiscriminatory basis for the decision not to promote Fulford. They were more likely a pretext to keep a qualified black man from acquiring seniority rights in a high-paying job." (App. at 198).
 
 
 41
 Finding that Fulford had established his Title VII claim, the court awarded him class one status on the machine operator roster as of November 15, 1982, and required that he be recalled to class one positions as of that date. In addition, the court awarded Fulford back pay as well as attorneys' fees as the prevailing party, pursuant to 42 U.S.C. Secs. 2000e-5(k) and 1988. The court further found it appropriate to impose sanctions against Conrail for its failure to produce requested documents prior to trial. In this regard, the court relied on the provisions of Fed.R.Civ.P. 16(f) and 37(b) which allow a court to enter such orders as it deems just for a party's failure to obey a scheduling order.[3] Additionally, the court relied on 28 U.S.C. Sec. 1927[4] for authority to "require an attorney personally to pay the 'excess costs, expenses and attorneys' fees reasonably incurred' when the attorney 'multiplies the proceedings ... unreasonably and vexatiously.' " In re Jacques, 761 F.2d 302, 306 (6th Cir.1985), cert. denied, sub nom., Jacques v. Aldrich, 106 S.Ct. 1259 (1986). The court found that Conrail's belated production of documents during trial violated not only the court's February 22, 1985, order but also caused plaintiff's counsel to expend considerable trial time outlining personnel records which were incomplete.
 
 IV.
 
 42
 District court findings in employment discrimination cases shall not be reversed when supported by coherent testimony and documentary evidence. Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985). Furthermore, "[w]hen findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings, for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." Id. at 575 (citation omitted). Under the foregoing standard of review, we have no difficulty in upholding the trial judge's findings in this case. Although defendant protests vehemently that the court totally disregarded evidence confirming that seniority alone was the determinative factor in awarding the crane operator position, neither the collective bargaining agreement nor the company's actions support this contention. As observed by the court below, Rule 3, Section 1, explicitly states that seniority shall govern, "qualification being sufficient." One of Conrail's own officers admitted that awards were made on the basis of seniority to those applicants who were at least minimally qualified for the position. Given defendant's contention, we find it curious indeed that Conrail included in its posted advertisement a section on "Qualifications." Surely this would be unnecessary if the most senior bidder were automatically awarded the job and then given a thirty-day period to prove he was "minimally qualified" for the position. It was for the district court to determine, in the first instance, whether Conrail's proffered nondiscriminatory reason was in fact the true reason for its employment decision. Finding evidence in the record to support the court's conclusion that it was not, we will not disturb those findings.
 
 
 43
 With respect to the award of attorneys' fees under Rule 37 and 28 U.S.C. Sec. 1927, Conrail argues on appeal that the failure of plaintiff to show prejudice to his case or bad faith on defendant's part precludes such an award. This circuit has recently construed 28 U.S.C. Sec. 1927 in Jones v. Continental Corp., 789 F.2d 1225 (6th Cir.1986). We distinguished between "bad faith" required for an award of fees under the "inherent powers" doctrine set forth by the Supreme Court in Roadway Express, Inc. v. Piper, 447 U.S. 752 (1980), and the amended provisions of 28 U.S.C. Sec. 1927:
 
 
 44
 To hold that subjective "bad faith" remains as necessary under amended Sec. 1927 as under Roadway Express would be to assume that the amendment added nothing to the "inherent powers" recognized in that case. Since we must assume that Congress intended the post-Roadway Express change in Sec. 1927 to have effect, we hold that 28 U.S.C. Sec. 1927 authorizes a court to assess fees against an attorney for "unreasonable and vexatious" multiplication of litigation despite the absence of any conscious impropriety. An attorney's ethical obligation of zealous advocacy on behalf of his or her client does not amount to carte blanche to burden the federal courts ... by pursuing nonfrivolous claims through the use of multiplicative litigation tactics that are harassing, dilatory, or otherwise "unreasonable and vexatious."
 
 
 45
 Jones, 789 F.2d at 1230.
 
 
 46
 In the case at bar, the court found that the documents produced by Conrail after plaintiff had rested his case were ones which had been requested by plaintiff during discovery and that their intentional withholding was, as testified to by Conrail's attorney, "a tactical decision." Clearly, the statute does not require a party to establish actual prejudice or surprise by the tardy revelation of pertinent evidence. It is sufficient if the withheld evidence caused an increase in time and expense incurred by the opposing party in developing a claim about which he was not fully informed.[5] And, as we explained in Jones, subjective bad faith is not the criteria by which such an award must be judged. Rather, such award is justified if the court finds that valuable legal resources were consumed unnecessarily as a result of willful concealment or delay in producing documents essential for case preparation. The court so found in this case, and we ascertain no abuse of discretion in such a finding. Therefore, the decision of the district court is AFFIRMED.
 
 
 
 [1]
 28 U.S.C. Sec. 1927 states:
 Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.
 
 
 [2]
 As the district court explained in its findings of fact, in Conrail's motion for summary judgment, they offered the trackman roster in support of its contention that plaintiff had less seniority than the three men awarded the position. Conrail argued the seniority applicable to the crane operator position was governed solely by the trackman roster. The motion was denied after it was brought to light that the trackman roster was not the roster used to award the position at issue in this case
 
 
 [3]
 Fed.R.Civ.P. 16(f) provides in relevant part:
 If a party or party's attorney fails to obey a scheduling or pretrial order ... the judge, upon motion or his own initiative, may make such orders with regard thereto as are just.... In lieu of or in addition to any other sanction, the judge shall require the party or attorney representing him or both to pay the reasonable expenses incurred because of any noncompliance with this rule, including attorney's fees....
 Rule 37 permits a court to impose sanctions against a party who has failed to cooperate in discovery. In this case, the court had entered an order on February 22, 1985, requiring the parties to exchange exhibits no later than April 15, 1985. Conrail offered certain exhibits at trial on April 29, 1985, in violation of this order.
 
 
 [4]
 See, supra, note 1
 
 
 [5]
 Of course, Sec. 1927 authorizes only an award of excess attorney's fees and is not a blanket award of all fees resulting from the litigation. See Morris v. Adams-Millis Corp., 758 F.2d 1352 (10th Cir.1985)